**[J-82-2021]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| PENNSYLVANIA ENVIRONMENTAL DEFENSE FOUNDATION, | : | No. 65 MAP 2020 |
| | : | |
| | : | Appeal from the Order of the |
| Appellant | : | Commonwealth Court at No. 358 |
| | : | MD 2018 dated October 22, 2020. |
| | : | |
| v. | : | ARGUED: December 8, 2021 |
| | : | |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| AND TOM WOLF, IN HIS OFFICIAL | : | |
| CAPACITY AS GOVERNOR OF | : | |
| PENNSYLVANIA, | : | |
| | : | |
| Appellees | : | |

## OPINION

**CHIEF JUSTICE BAER**                    **DECIDED: August 5, 2022**

The Pennsylvania Environmental Defense Foundation ("PEDF") comes before this Court for the third time challenging the use of proceeds from oil and gas leasing on the Commonwealth's forest and park lands as violative of Article I, Section 27 of the Pennsylvania Constitution, also known as the Environmental Rights Amendment. ("Section 27" or "ERA"), which created a trust to conserve and maintain Pennsylvania's public natural resources.[1]  In the first two cases, PEDF challenged several 2009-2015

---

[1] Article I Section § 27, entitled "Natural resources and the public estate." provides in full as follows:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic

budgetary provisions enacted in the wake of the dramatic increase in oil and gas revenue resulting from Marcellus Shale exploration in Pennsylvania. Applying trust principles, this Court held that the budgetary provisions violated Section 27 by utilizing the oil and gas revenue for non-trust purposes via transfers to the General Fund. *PEDF v. Commonwealth*, 161 A.3d 911 (Pa. 2017) ("*PEDF II*"); *PEDF v. Commonwealth*, 255 A.3d 289 (Pa. 2021) ("*PEDF V*").

PEDF's current declaratory judgment action filed against the Commonwealth of Pennsylvania and Governor Tom Wolf (collectively, "the Commonwealth"), raises numerous constitutional challenges to provisions of the General Appropriations Act of 2017 and 2018, as well as the 2017 Fiscal Code amendments, all of which were enacted after our decision in *PEDF II*.[2] As discussed in detail below, these challenges can be grouped into several categories. First, PEDF contests the constitutionality of the use of trust resources to fund the Department of Conservation and Natural Resources' ("DCNR's") general operations. Second, PEDF seeks a declaration that the revenue from oil and gas leasing on State forest and park lands should be reserved for environmental programs tied to the Marcellus Shale region from which the oil and gas revenue derived. Third, PEDF challenges the repeal of the Oil and Gas Lease Fund Act and the transfer of

---

values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. 1, § 27.

[2] General Appropriations Act of 2017, Act of July 11, 2017, P.L. 1279, No. 1A, §§ 104(P), 1601; General Appropriations Act of 2018, Act of June 22, 2018, P.L. 1203, No. 1A, §§ 104(P), 1601; 72 P.S. §§ 1601.2-E; 1726-G.

the Oil and Gas Lease Fund ("Lease Fund") to the control of the General Assembly.[3] Finally, PEDF questions the constitutionality of specific aspects of the Lease Fund. For the reasons set forth below, we conclude that PEDF has failed to demonstrate that the challenged provisions violate the Pennsylvania Constitution. Accordingly, we affirm the order of the Commonwealth Court, although based on different reasoning.

## I.   *PEDF II* and *IV* [4]

Our decisions addressing PEDF's prior challenges elucidate several principles of Pennsylvania's nascent Section 27 jurisprudence directly applicable to the case at bar.

---

[3] 71 P.S. §§ 1331-1333 (repealed).

[4] PEDF's declaratory judgment actions have generated numerous opinions from this Court and the Commonwealth Court. As the parties to these actions are identical, so too are the captions. Accordingly, we will use the following numerical indicators to differentiate the opinions, which we describe in more detail in the body of this opinion.

The Commonwealth Court first addressed PEDF's challenges to the 2009-2015 budgetary provisions in *PEDF v. Commonwealth*, 108 A.3d 140 (Pa. Cmwlth. 2015) (*"PEDF I"*), which this Court reversed in *PEDF v. Commonwealth*, 161 A.3d 911 (Pa. 2017) ("*PEDF II*"), concluding that royalties from the oil and gas leasing must be returned to the trust corpus and remanding for the Commonwealth Court to apply private trust principles to address the bonus payments, rents, and interest payments. On remand, the Commonwealth Court applied what it deemed to be relevant private trust law principles in *PEDF v. Commonwealth*, 214 A.3d 748 (Pa. Cmwlth. 2019) ("*PEDF III*").

While the remand following *PEDF II* was pending in the Commonwealth Court, PEDF filed the instant declaratory judgment action in that court challenging the 2017 and 2018 budgetary provisions, enacted after our 2017 decision in *PEDF II*. The Commonwealth Court's unpublished decision adjudicating the challenges to the 2017 and 2018 provisions can be found at *PEDF v. Commonwealth*, 2020 WL 6193643, at *1 (Pa. Cmwlth. 2020), and will be referenced herein as *PEDF IV.*

PEDF's current appeal of *PEDF IV* was pending in this Court when we reversed the Commonwealth Court's decision in *PEDF III* in *PEDF v. Commonwealth*, 255 A.3d 289, 294 (Pa. 2021) (*PEDF V*). While we will utilize the designations of *PEDF I-V* in this opinion, we will strive to clarify the relevant decisions with descriptive phrases where possible.

As noted, PEDF challenged several 2009-2015 amendments to the Fiscal Code, as well as a provision of the Supplemental General Appropriations Act of 2009.[5] Broadly considered, these provisions diverted revenues from the oil and gas leases on State forest and park lands into the General Fund under the control of the General Assembly.

Prior to the challenged enactments and pursuant to the Oil and Gas Lease Fund Act, all rents and royalties from oil and gas leasing on state land were deposited into the Lease Fund and appropriated entirely to the DCNR (or its predecessor) to be "exclusively used for conservation, recreation, dams, or flood control."[6] 71 P.S. §§ 1331, 1333 (repealed). In contrast, the 2009-2015 budgetary enactments, *inter alia*, provided that royalties from the Lease Fund could only be expended if "appropriated or transferred to the General Fund by the General Assembly[,]" apart from an annual appropriation of up to $50 million to the DCNR, with the direction that the DCNR "shall give preference to the operation and maintenance of State parks and forests." 72 P.S. §§ 1602-E, 1603-E.

While additional appropriations were made to the DCNR from the Lease Fund through legislative direction, other enactments directed funds to the General Fund without any restriction that they be used for conservation purposes. 72 P.S. §§ 1604-E, 1605-E. Concomitantly, the DCNR received decreased funding from the General Fund. Thus, "a larger portion of monies from the Lease Fund [were] used to pay for the DCNR's operational expenses, which had previously been funded by the General Fund, and thus reduced the amount of monies available for the DCNR's conservation activities." *PEDF II*, 161 A.3d at 923. PEDF argued that these provisions violated the Commonwealth's fiduciary duties under the ERA.

---

[5] Specifically, PEDF challenged 72 P.S. §§ 1602-E -1605-E as well as Act of Oct. 9, 2009, P.L. 779, No. 10A, § 1912.

[6] The Oil and Gas Lease Fund Act is set forth in full *infra*. *PEDF II* provides a more extensive historical perspective relating to the creation of the DCNR and the Oil and Gas Lease Fund Act. *PEDF II*, 161 A.3d at 919-920.

In addressing these claims, this Court in *PEDF II* adopted the reasoning of the landmark decision in *Robinson Township v. Commonwealth*, 83 A.3d 901 (Pa. 2013) (plurality), which revitalized the long dormant Environmental Rights Amendment. Notably, the ERA is included in Article I and, thus, is among the rights reserved to the people that are "excepted out of the general powers of government and shall forever remain inviolate." PA. CONST. art. 1, § 25.[7] We explained that the ERA established "a public trust, pursuant to which the natural resources are the corpus of the trust, the Commonwealth is the trustee, and the people are the named beneficiaries." *PEDF II*, 161 A.3d at 931-32.

This constitutional public trust imposed fiduciary duties on Commonwealth entities to "conserve and maintain [our public natural resources] for the benefit of all the people." PA. CONST. art. 1, § 27. Drawing from *Robinson Township*, we explained that "[t]he plain meaning of the terms conserve and maintain implicates a duty to prevent and remedy the degradation, diminution, or depletion of our public natural resources" and a duty to act toward the corpus of the trust "with prudence, loyalty, and impartiality." *PEDF II,* 161 A.3d at 932 *(quoting Robinson Twp.*, 83 A.3d at 957). The Court concluded that the public trust was subject to basic trust principles in effect at the time of enactment of the ERA, including the restriction that proceeds from the sale of trust assets should remain part of the corpus of the trust and that trust assets could be used "only for purposes authorized by the trust or necessary for the preservation of the trust." *PEDF II*, 161 A.3d at 933.

---

[7] Section 25, entitled "Reservation of powers in people" provides:

> To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government and shall forever remain inviolate.

PA. CONST. art. 1, § 25.

In *PEDF II*, this Court held that the royalties generated by the oil and gas leases clearly derived from the sale of trust assets and, thus, had to be returned to the trust corpus. Accordingly, we deemed facially unconstitutional those statutory provisions that directed royalties to be paid over to the General Fund without any restrictions that the funds be used for conservation and maintenance of trust assets. *Id.* at 937-38. In so doing, however, we clarified "that the legislature's diversion of funds from the Lease Fund (and from the DCNR's exclusive control) does not, in and of itself, constitute a violation of Section 27." *Id.* at 939. Indeed, "the General Assembly would not run afoul of the constitution by appropriating trust funds to some other initiative or agency dedicated to effectuating Section 27." *Id.*

While the Court had sufficient information to determine the constitutionality of the statutes addressing royalties, which indisputably arose from the sale of trust assets, we remanded to the Commonwealth Court to address the other revenue streams generated by the leases, including bonus payments, rental fees, and interest penalties. We directed that court to apply the Pennsylvania trust principles in effect when Section 27 was adopted to determine whether these revenue streams should be deemed trust assets and restricted to trust purposes. *Id.* at 935-36.

Following remand, this Court, in *PEDF V*, rejected the Commonwealth Court's analysis which derived from that court's classification of current Pennsylvanians as life tenants and future generations as remaindermen.[8] Diverging from the Commonwealth

---

[8] In its analysis, the Commonwealth Court utilized Section 9 of the Principal and Income Act of 1947 ("1947 Act"), which was applicable at the time of the ERA's enactment and "govern[ed] trusts where the trustee is authorized to sell, lease or otherwise develop such natural resources and no provision is made for the disposition of the net proceeds." *PEDF III*, 214 A.3d at 768 (citing Act of July 5, 1947, P.L. 1283, *as amended, formerly* 20 P.S. §§ 3470.1-3740.15). This statute apportioned proceeds of the trust between life tenants and remaindermen. *Id.* at 765.

Court, we concluded that the constitutional text did not create successive beneficiaries of current and future Pennsylvanians but rather established a cross-generational unity of interest in the conservation and maintenance of the public natural resources through Section 27's use of the phrase "all the people." *PEDF V*, 255 A.3d at 309-10 (relying upon *Robinson Twp.*, 83 A.3d at 959). Accordingly, we concluded that the ERA created "simultaneous beneficiaries with equal interest in the trust's management," which negated any allocation of income between life tenants and remaindermen, a distinction created in the Commonwealth Court's analysis. *Id.* at 310. We nevertheless agreed with the Commonwealth Court's determination that the bonus payments, rental fees, and interest fees were income rather than funds resulting from the sale of trust assets. *Id.* at 308. The question remaining was whether this income should be reserved solely for trust purposes.

In considering this question, the Court observed that Pennsylvania trust law clearly provided that a trustee has a duty to deal impartially with all beneficiaries. *Id.* at 311 (citing RESTATEMENT (SECOND) OF TRUSTS § 183 and 20 Pa.C.S. § 7773). Under the ERA, the benefit accorded to the people of Pennsylvania as beneficiaries is not an entitlement to income but rather the conservation and maintenance of public natural resources. Given "the absence of income entitlements, there is no authority for [the Commonwealth]

Under this statute, life tenants were entitled to one-third of the net proceeds, while two-thirds had to be reserved to the trust corpus. Accordingly, the Commonwealth Court declined to find the remaining 2009-2015 budgetary provisions facially unconstitutional as PEDF had not demonstrated that the non-trust uses exceeded one-third of the proceeds from rent and bonus payments.

Relevantly, the Commonwealth Court applied the same analysis to PEDF's current challenges to the 2017 and 2018 budgetary provisions, as discussed *infra*. For the reasons stated in *PEDF V*, we again are restrained to reject the Commonwealth Court's analysis to the extent it relied upon the 1947 Act's division of revenue between life tenants and remaindermen.

to generate income from oil and gas assets and then use that income to benefit itself for non-trust purposes and not the beneficiaries." *Id.* at *313.*

Thus, the Court held that "the income generated from bonus payments, rentals, and late fees must be returned to the corpus to benefit the conservation and maintenance of the public resources for all the people" and could not be diverted to non-trust purposes of the General Fund. *Id.* at 314. Accordingly, the challenged 2009-2015 budgetary provisions were facially unconstitutional as they directed income to the General Fund without restriction. We nevertheless reiterated our observation in *PEDF II* that "the legislature's diversion of funds from the Lease Fund (and from the DCNR's exclusive control) does not, in and of itself, constitute a violation of Section 27," so long as the assets are directed to entities "dedicated to effectuating" Section 27's purpose of conserving and maintaining Pennsylvania's natural resources. *Id.* at 314 n.21 (quoting *PEDF II*, 161 A.3d at 939).

## II.     Procedural History and Standard of Review

The current challenge involves PEDF's 2018 petition for review filed pursuant to the Declaratory Judgement Act, 42 Pa.C.S. §§ 7531-7541, seeking numerous declarations that certain provisions in the General Appropriations Acts of 2017 and 2018, as well as in the 2017 amendments to the Fiscal Code, violate the ERA.[9] In its answer

---

[9] The Commonwealth Court summarized the declarations sought by PEDF as follows:

> (1) the appropriations from the Lease Fund contained in Sections 104(P) and 1601 of the General Appropriation Acts of 2017 and 2018 for the DCNR's government operations are facially unconstitutional;

> (2) the use of these appropriations for environmental initiatives beyond Pennsylvania's Marcellus Shale region are likewise facially unconstitutional;

and new matter, the Commonwealth responded in opposition to each of PEDF's proposed declarations. Ultimately, the parties filed cross-applications for summary relief, which the Commonwealth Court granted in part and denied in part.[10] PEDF appealed to this Court,

> (3) the repeal of the act commonly referred to as the 1955 Oil and Gas Lease Fund Act (1955 Lease Fund Act) is facially unconstitutional;
>
> (4) Section 1601.2-E of The Fiscal Code is facially unconstitutional;
>
> (5) Section 1726-G of The Fiscal Code is facially unconstitutional; and
>
> (6) affirmative legislation and a detailed accounting are required to ensure that the Lease Fund is protected and used in accordance with Section 27.

*PEDF IV*, 2020 WL 6193643, at *3 (reformatted).

[10] As will be explained in detail *infra*, the Commonwealth Court made the following determinations:

> We grant [PEDF's] Application insofar as it seeks a declaration that the Commonwealth is required to maintain accurate records of the Lease Fund and track trust principal as part of its trustee duties, and we deny the Application in all other respects.
>
> We grant the Commonwealth's Application for Summary Relief upon concluding that the following legislative enactments are not facially unconstitutional: Sections 104(P) and 1601 of the General Appropriation Acts of 2017 and 2018; the repeal of the 1955 Lease Fund Act; Section 1601.2-E of The Fiscal Code; and Section 1726-G of The Fiscal Code.
>
> We also grant the Commonwealth's declaratory request that Lease Fund money, including trust principal, may be expended on environmental conservation initiatives beyond the Marcellus Shale region.

asking us to reverse the Commonwealth Court in relevant part and to grant the denied declarations.

In reviewing "the Commonwealth Court's decision on cross-motions for summary relief pursuant to Pa.R.A.P. 1532(b), we may grant relief only if no material questions of fact exist and the right to relief is clear." *PEDF II*, 161 A.3d at 929 (citations omitted). The parties agree that this case does not involve any issues of fact but rather solely presents pure questions of law. *PEDF IV*, 2020 WL 6193643, at *4. Thus, "our standard of review is *de novo*, and our scope of review is plenary." *PEDF II*, 161 A.3d at 929.

In challenging the constitutionality of duly enacted statutory provisions that are presumed to be constitutional, PEDF bears the burden of demonstrating that the provisions "clearly, plainly, and palpably" violate the Constitution. *Id*. As PEDF presents facial challenges to the statutes, we reiterate that "[a] statute is facially unconstitutional only where there are no circumstances under which the statute would be valid." *Germantown Cab Company v. Philadelphia Parking Authority*, 206 A.3d 1030, 1041 (Pa. 2019).

As this Court opined in *PEDF II*, our review of the Commonwealth's actions challenged under the ERA requires careful consideration of "the text of Article I, Section 27 as well as the underlying principles of Pennsylvania private trust law in effect at the time of its enactment." *Id.* at 930.

Applying basic principles of trust law, the Commonwealth must "administer the [Section 27 trust] in good faith, in accordance with its provisions and purposes and the

---

> However, we deny the Commonwealth's Application insofar as it seeks a declaration that its current usage of the trust is wholly consistent with its Section 27 trustee responsibilities and that affirmative legislation is not necessary.

*Id.* at *17 (reformatted).

interests of the beneficiaries and in accordance with applicable law." 20 Pa.C.S. § 7771. Moreover, the Commonwealth has a duty to treat the corpus of the trust with loyalty, impartiality, and prudence. *PEDF II,* 161 A.3d at 932. The duty of loyalty includes "administer[ing] the trust solely in the interest of the beneficiaries[,]" which include "all the people" of Pennsylvania, "including generations yet to come." 20 Pa.C.S. § 7772; PA. CONST. art. 1, § 27. Moreover, in acting impartially, a trustee is required to give "due regard to the beneficiaries' respective interests in light of the purposes of the trust," which requires equitable rather than equal treatment.[11] 20 Pa.C.S. § 7773. Finally, "prudent administration" by a trustee entails administering the trust "as a prudent person would, by considering the purposes, provisions, distributional requirements and other circumstances of the trust and by exercising reasonable care, skill and caution." 20 Pa.C.S. § 7774.

In light of these broad trust principles, we reiterate that Section 27 imposes fiduciary duties on Commonwealth entities to "conserve and maintain [Pennsylvania's public natural resources] for the benefit of all the people," which includes a "duty to prevent and remedy the degradation, diminution, or depletion of our public natural resources." PA. CONST. art. 1, § 27; *PEDF II,* 161 A.3d at 932 *(quoting Robinson Twp.*, 83 A.3d at 956-57).

### III.    Analysis

---

[11] The duty of impartiality is defined as follows:

> If a trust has two or more beneficiaries, the trustee shall act impartially in investing, managing and distributing the trust property, giving due regard to the beneficiaries' respective interests in light of the purposes of the trust. The duty to act impartially does not mean that the trustee must treat the beneficiaries equally. Rather, the trustee must treat the beneficiaries equitably in light of the purposes of the trust

20 Pa.C.S. § 7773.

As stated, PEDF sought numerous declarations, which the Commonwealth Court granted in part and denied in part. PEDF filed a direct appeal from that determination to this Court, again raising numerous challenges, which can be grouped in four categories. First, PEDF challenges the use of Lease Fund monies to fund the general operations of the DCNR. Second, PEDF faults the allocation of Lease Fund monies for environmental projects outside of the Marcellus Shale region from which the monies derived. Third, PEDF contends that the repeal of the Oil and Gas Lease Fund Act and the transfer of the Lease Fund to the control of the General Assembly violates the ERA. Finally, PEDF challenges specific statutory provisions governing the funding of the Lease Fund and appropriations to other funds. We address these issues *seriatim*.[12]

## A. Funding the General Operations of the DCNR

PEDF seeks a declaration that Sections 104(P) and 1601 of the General Appropriation Acts of 2017 and 2018 violate the Commonwealth's trustee duties by using trust resources to pay for the general operations of the DCNR.[13] PEDF specifically

---

[12] Following the decision in *PEDF V*, this Court permitted the parties to file supplemental briefing. For ease of discussion, we provide a single recitation of the parties' arguments gleaned from their presentations to the Commonwealth Court as well as to this Court. We do not address the parties' arguments responding to the Commonwealth Court's analysis in *PEDF III,* which this Court subsequently rejected in *PEDF V.*

[13] Section 104(P) of the General Appropriations Act of 2017, Act of July 11, 2017, P.L. 1279, provided as follows:

> (p) Oil and Gas Lease Fund. -- The following sums set forth in this act, or as much thereof as may be necessary, are hereby specifically appropriated from the Oil and Gas Lease Fund to the hereinafter named agencies of the Executive Department of the Commonwealth for the payment of salaries, wages or other compensation and travel expenses of the duly appointed officers and employees of the Commonwealth, for the payment of fees for contractual services rendered, for the purchase or rental of goods and services and for payment of

contends that revenue from oil and gas leases of State forest and park lands deposited in the Lease Fund should not be appropriated to pay DCNR's general operations, including *inter alia,* the "salaries, wages or other compensation and travel expenses" of DCNR officers and employees of the Commonwealth, or for the "purchase or rental of goods and services" or "any other expenses . . . necessary for the proper conduct of the duties, functions and activities." Section 104(P). PEDF maintains that Section 27 does not authorize the Commonwealth "to sell State Forest assets to generate revenue for the general operating expenses of DCNR," as such sales would deplete the resource, contrary to the goal of conserving and maintaining Pennsylvania's natural resources. PEDF Supp. Brief at 7.

PEDF additionally argues that these General Appropriations Act provisions violate Section 25 by using Lease Fund monies to replace appropriations from the General Fund. As an explanation for its position, PEDF alleges that the "passage of an annual appropriation act to fund general government operations for the current fiscal year is an Article III responsibility of the Commonwealth and cannot infringe" on the people's rights under Article I, Section 27, which are "excepted out of the general powers of government

_____

> any other expenses, as provided by law or by this act, necessary for the proper conduct of the duties, functions and activities and for the purposes hereinafter set forth for the fiscal year beginning July 1, 2017, and for the payment of bills incurred and remaining unpaid at the close of the fiscal year ending June 30, 2017.

The General Appropriations Act of 2018 contained a functionally identical Section 104(P). Act of June 22, 2018, P.L. 1203. We reference these provisions collectively as "Section 104(P)."

Section 1601 of the 2017 General Appropriations Act appropriated to the DCNR $50 million for general operations, nearly $8 million for state park operations, and approximately $3.5 million for state forest operations. The following year, Section 1601 allocated to the DCNR approximately $37 million for general operations, $7.5 million for state park operations, and $4.2 million for state forest operations.

and shall forever remain inviolate" under Section 25. PEDF Brief at 28 (quoting PA. CONST. art. 1, § 25). It contends that Commonwealth entities cannot violate their obligations as Section 27 trustees in order "to fulfill their constitutional duties under Articles III, IV, or V of the Pennsylvania Constitution to raise revenue to fund general budgetary matters." PEDF Supp. Brief at *3.*

The Commonwealth refutes PEDF's argument by observing that "[c]onservation and maintenance activities are not accomplished in a vacuum: they require people and equipment." *PEDF IV*, 2020 WL 6193643, at *5. It contends that the funding of DCNR's general operations is a proper use of trust fund assets as the funding allows DCNR to perform its trustee duties to conserve and maintain Pennsylvania's public natural resources; the Commonwealth emphasizes that "DCNR's main purpose is to effectuate Section 27." Cmwlth. Supp. Brief at 7. It highlights that trust law provides for trustees "to incur expenses which are necessary or appropriate to carry out the purposes of the trust and are not forbidden by the terms of the trust." *Id.* at 11 (quoting RESTATEMENT (SECOND) OF TRUSTS § 188 (1959)).

The Commonwealth contrasts the provisions challenged herein with the statutes deemed unconstitutional in *PEDF II*, which "removed DCNR's ability to act as trustee because the funds were placed in the General Fund, potentially for non-conservation purposes." Cmwlth. Brief at 14 (quoting *PEDF II*, 161 A.3d at 927). In contrast, the current provisions "appropriate the funds directly to the DCNR so that it can continue its conservation and maintenance efforts." *Id.* Thus, the Commonwealth asserts that the allocation of lease fund monies for DCNR's general operation does not violate the Commonwealth's trustee duties under the ERA.

Rather than resolving the constitutionality of using trust resources to fund DCNR's operations, the Commonwealth Court instead relied upon its then-recent analysis in *PEDF III*, which this Court subsequently respectfully rejected in *PEDF V*. As discussed

*supra*, the Commonwealth Court in *PEDF III* reasoned that one-third of the revenue derived from rents and bonus payments could be used for non-trust purposes under the Act of 1947, applicable at the time of the ERA's adoption.

Applying the *PEDF III* analysis to the instant case, the Commonwealth Court distinguished the royalty transfers that this Court deemed unconstitutional in *PEDF II* from the current provisions, which involved transfers from the Lease Fund generally, thus including not only royalties but also rents and bonus payments. Given this distinction, the court held that one-third of the proceeds derived from rents and bonus payments in the Lease Fund could be allocated to non-trust purposes under *PEDF III.* Having reasoned that it did not violate fiduciary duties for the Commonwealth to utilize one-third of these funds for non-trust purposes, the Commonwealth Court concluded that PEDF failed to demonstrate that the statute was "facially unconstitutional" under Section 27, as it was possible that the challenged transfers could have been encompassed within the one-third deemed non-trust assets. *PEDF IV*, 2020 WL 6193643, at *7.[14]

While it is understandable that the Commonwealth Court utilized its *PEDF III* analysis in the instant case given that it pre-dated *PEDF V*, this portion of the court's analysis cannot stand as it is directly contrary to *PEDF V*. *PEDF V*, 255 A.3d at 293. We nevertheless affirm the Commonwealth Court's ultimate holding, denying PEDF's motion seeking a declaration that Sections 104(P) and 1601 of the General Appropriations Acts of 2017 and 2018 violated the ERA. *See Ario v. Ingram Micro, Inc.*, 965 A.2d 1194, 1200 (Pa. 2009) ("[A]n appellate court may uphold an order of a lower court for any valid reason appearing from the record").

---

[14] The Commonwealth Court likewise found that PEDF's Section 25 challenge failed as it hinged on a violation of Section 27. The court additionally denied the Commonwealth's request to declare constitutional its use of Lease Fund monies for DCNR's general operations.

In addressing PEDF's claim, we apply fundamental principles of Pennsylvania trust law. As explained in *PEDF II*, a "trustee may use the assets of the trust only for purposes authorized by the trust or necessary for the preservation of the trust." *PEDF II*, 161 A.3d at 933 (internal quotation marks omitted). One of the basic duties of a trustee is to administer the trust, and Pennsylvania's trust law provides that a trustee may incur costs in administering the trust, so long as the costs "are reasonable." 20 Pa.C.S. § 7775.[15] The Uniform Trust Law as adopted in Pennsylvania further empowers a trustee to pay "the compensation of the trustee and employees and agents of the trustee and other expenses incurred in the administration of the trust." 20 Pa.C.S. § 7780.6(a)(8) (listing "illustrative powers of trustee"); *see also* 20 Pa.C.S. § 7769 ("A trustee is entitled to be reimbursed out of the trust property . . . [for] expenses that were properly incurred in the administration of the trust.").

As applied to the trust created by Section 27, this basic trust law clearly empowers the Commonwealth, as trustee, to incur reasonable costs in administering the trust to conserve and maintain Pennsylvania's public natural resources. As noted by the Commonwealth, conservation and maintenance does not occur in a vacuum but instead require people and materials, and in particular the people and materials of the DCNR, which is the cabinet-level advocate for our State forest and park lands, as well as other natural resources. 71 P.S. § 1340.101(b). DCNR's primary mission is, *inter alia*, "to maintain, improve and preserve State parks [and] to manage State forest lands," which

---

[15] "In administering a trust, the trustee may incur only costs that are reasonable in relation to the trust property, the purposes of the trust and the skills of the trustee." 20 Pa.C.S. § 7775; *see also* RESTATEMENT (SECOND) OF TRUSTS § 188 (1959) ("The trustee can properly incur expenses which are necessary or appropriate to carry out the purposes of the trust and are not forbidden by the terms of the trust, and such other expenses as are authorized by the terms of the trust."). Similarly, "[a] trustee shall administer the trust as a prudent person would, by considering the purposes, provisions, distributional requirements and other circumstances of the trust and by exercising reasonable care, skill and caution." 20 Pa.C.S. § 7774.

are indisputably in furtherance of the purposes of the Section 27 trust.[16]  *Id.*  Given these statutory responsibilities, we conclude that the use of trust assets to fund DCNR's operations is within the authority of the Commonwealth as trustee to incur costs in administering the Section 27 trust, absent demonstration that these administrative costs

---

[16] In full, the Conservation and Natural Resources Act explains the primary mission of the DCNR as follows:

> The primary mission of the Department of Conservation and Natural Resources will be to maintain, improve and preserve State parks, to manage State forest lands to assure their long-term health, sustainability and economic use, to provide information on Pennsylvania's ecological and geologic resources and to administer grant and technical assistance programs that will benefit rivers conservation, trails and greenways, local recreation, regional heritage conservation and environmental education programs across Pennsylvania.

71 P.S. § 1340.101; *see also* 71 P.S. §§ 1340.302-312 (setting forth DCNR's statutory authority).  Our colleagues in dissent on this issue question whether all of DCNR's statutory responsibilities are consistent with its Section 27 trustee duties to conserve and maintain Pennsylvania's public natural resources.  *See* Concurring and Dissenting Opinion at 6 (Dougherty, J.) (viewing aspects of DCNR's mission as "not explicitly related to the trustees' Article I, Section 27 duties").

Respectfully, we decline to determine whether all of DCNR's statutory responsibilities qualify as trust purposes because PEDF, in the current litigation, presents a facial challenge to the use of trust assets for DCNR's general operations, rather than challenging DCNR's use of trust funds for specific administrative costs.  We further observe that our nascent Section 27 jurisprudence has not explored what activities qualify as trust purposes.  Accordingly, while it appears that many, if not all, of DCNR's responsibilities are consistent with Section 27, we do not speak to those issues herein. Rather, for purposes of this case, we conclude that the existence of these other duties does not undermine our rejection of PEDF's facial challenge to the appropriation of trust assets for DCNR's general operations, as the challenged provisions are not inconsistent with DCNR's use of the trust assets solely for trust purposes.  *See Germantown Cab Company v. Philadelphia Parking Authority*, 206 A.3d 1030, 1041 (Pa. 2019) ("A statute is facially unconstitutional only where there are no circumstances under which the statute would be valid.").

are unreasonable or that the DCNR has failed to act with prudence, loyalty, or impartiality in carrying out its fiduciary duties.[17]

As we conclude that PEDF failed to demonstrate that the provisions violate Section 27, we likewise find no violation of Section 25. Accordingly, we affirm the Commonwealth Court's denial of PEDF's requested declaration.

## B. Funding Environmental Projects Outside of the Marcellus Shale Region

PEDF seeks a declaration that Sections 104(P) and 1601 violate the ERA by allocating funds derived from oil and gas leasing in Pennsylvania's Marcellus Shale region for environmental projects in other parts of the state. It avers that Commonwealth trustees should not be permitted "to deplete, degrade, or diminish our State Forest and Park public natural resources to benefit another resource." PEDF Brief at 45. Utilizing the term "State Forest and Park trust corpus," PEDF contends that the corpus of this trust should be reserved solely for the region from which the revenue derived to remedy any detrimental effects of the Marcellus Shale leasing. *Id.*

The Commonwealth responds that the plain language of Section 27 does not provide geographic restrictions on the use of trust resources. The Commonwealth instead emphasizes this Court's recognition that trustees have "discretion with respect to the proper treatment of the corpus of the trust," so long as that discretion is exercised in support of the purpose of the trust. Cmwlth. Brief at 17 (quoting *PEDF II*, 161 A.3d at 933). It stresses that the Section 27 trust extends to the conservation and maintenance

---

[17] We additionally address a portion of PEDF's argument relying upon our decision in *PEDF II*, which deemed unconstitutional a statutory provision that gave preference to funding "the operation and maintenance of State parks and forests" rather than conservation purposes. *PEDF II*, 161 A.3d at 937-938 (quoting 72 P.S. § 1603–E). PEDF reads our decision as deeming the funding of DCNR's general operations to be a non-trust use. Respectfully, we reject PEDF's reading because this Court in *PEDF II* did not address whether the trust funds could be used to pay DCNR's general operations, which is the issue resolved herein.

of public natural resources across Pennsylvania, such that it is appropriate for DCNR to expend trust resources to "address the broad environmental threats faced by Pennsylvania," including those outside the Marcellus Shale region. *Id.* at 18. Indeed, it contends that restricting the use of these funds to the Marcellus Shale region would arguably violate the Commonwealth's fiduciary duty of impartiality to the beneficiaries across Pennsylvania. Cmwlth. Supp. Brief at 19, 26. Moreover, the Commonwealth observes that at the time of the ERA's enactment, use of the Lease Fund was not restricted to the area that produced the funds but instead was intended to be used "for conservation, recreation, dams, or flood control." *Id.* at 19 (quoting 71 P.S. § 1331 (repealed)).

In reviewing these claims, the Commonwealth Court found PEDF's proposed geographic restriction of the use of funds to be "myopic," when the Commonwealth was confronting a multitude of "environmental threats from climate change to polluted waters to invasive species." *PEDF IV*, 2020 WL 6193643, at *8. The court instead opined that DCNR had discretion as trustee to determine how trust funds should be used to conserve and maintain all of Pennsylvania's natural resources. Accordingly, the court denied PEDF's requested declaration and granted the Commonwealth's related declaration, holding that "the appropriations contained in Sections 104(P) and 1601 of the General Appropriation Acts of 2017 and 2018 to the DCNR for the operation of State parks and forests are not facially unconstitutional." *Id.* at *9.

While rejecting PEDF's declaration that the fund must be limited to the Marcellus Shale region, the Commonwealth Court nevertheless "caution[ed] the Commonwealth that the failure to remedy the degradation, diminution, or depletion of the State forests and parks impacted by Marcellus wells - the very public resources harmed in order to generate these funds - may constitute a failure to preserve the trust and a dereliction of its fiduciary duties under Section 27." *Id.* at *9 n.16.

As noted by the Commonwealth Court, the broad language of Section 27 instructs that "Pennsylvania's public natural resources are the common property of all the people, including generations yet to come" and that the Commonwealth, as "trustee of these resources," "shall conserve and maintain them for the benefit of all the people." PA. CONST. art. 1, § 27. Absent from this language is any regional segmentation of trust assets or beneficiaries nor a prioritization of regions deserving of conservation and maintenance efforts. Contrary to PEDF's terminology, our charter does not create a "State Forest and Park trust corpus." Instead, Section 27 speaks in the unifying terms of "Pennsylvania's natural resources" and twice encompasses "all the people." *Id.* Accordingly, we affirm the Commonwealth Court's denial of PEDF's proposed declaration seeking to regionalize Pennsylvania natural resources and to limit expenditure of oil and gas revenue to the Marcellus Shale Region from which it derived.[18]

## C. Oil and Gas Lease Fund Challenges

PEDF next asks this Court to deem unconstitutional the 2017 repeal of the 1955 Oil and Gas Lease Fund Act,[19] and the enactment of Section 1601.2-E of the Fiscal Code,

---

[18] PEDF raises a related issue in its challenge to Section 1601.2-E(e) of the Fiscal Code, set forth *infra* at 22 n.20. Section 1601.2-E(e) directs specific annual transfers from the Lease Fund to the Marcellus Legacy Fund for distribution to the Environmental Stewardship Fund and the Hazardous Sites Cleanup Fund.

PEDF alleges that these transfers violate Section 27 because these funds support statewide projects that are not limited to the Marcellus Shale region and not controlled by the DCNR, and also because these funds were previously supported through non-trust sources, including a waste disposal fee and the Capital Stock and Franchise Tax. As these allegations fail for the same reasons PEDF's challenges to the General Appropriations Act provisions fall, we will not address them separately below.

[19] The Oil and Gas Lease Fund Act was repealed in Section 20(2)(i) of the 2017 Fiscal Code Amendments, Act of October 30, 2017, P.L. 725 ("2017 Fiscal Code Amendments"). Prior to its repeal, the Act provided in full as follows:

which "continued" the Lease Fund "as a special fund in the State Treasury." 2017 Fiscal

Code Amendments § 20(2)(i); 72 P.S. § 1601.2-E(a).[20] The effect of Section 1601.2-E is

---

<div style="margin-left: 2em;">

Section 1. All rents and royalties from oil and gas leases of any land owned by the Commonwealth, except rents and royalties received from game and fish lands, shall be placed in a special fund to be known as the "Oil and Gas Lease Fund" which fund shall be exclusively used for conservation, recreation, dams, or flood control or to match any Federal grants which may be made for any of the aforementioned purposes.

Section 2. It shall be within the discretion of the [DCNR] to determine the need for and the location of any project authorized by this act. The Secretary of [DCNR] shall have the power to acquire in the name of the Commonwealth by purchase, condemnation or otherwise such lands as may be needed.

Section 3. All the moneys from time to time paid into the "Oil and Gas Lease Fund" are specifically appropriated to the [DCNR] to carry out the purposes of this act.

</div>

71 P.S. §§ 1331-1333 (repealed). When originally enacted in 1955, the Oil and Gas Lease Fund Act granted discretion over the funds to the Department of Forests and Waters. The General Assembly subsequently substituted the DCNR for the Department of Forests and Waters pursuant to the Conservation and Natural Resources Act (CNRA) in 1995. 71 P.S. § 1340.304(c). A more extensive recounting of the history of the Oil and Gas Lease Fund Act, the CNRA, and leasing on State forest and park lands can be found in this Court's decision in *PEDF V*, 255 A.3d at 293-294.

[20] Section § 1601.2-E, entitled "Oil and Gas Lease Fund" provides in full as follows:

<div style="margin-left: 2em;">

(a) Continuation. -- The fund is continued as a special fund in the State Treasury.

(b) Sources. -- The following shall be deposited into the fund:

</div>

(1) Rents and royalties from oil and gas leases of land owned by the Commonwealth, except rents and royalties received from game and fish lands.

(2) Amounts as provided under section 5 of the act of October 8, 2012 (P.L. 1194, No. 147), known as the Indigenous Mineral Resources Development Act.

(3) Any other money appropriated or transferred to the fund.

(c) Use. -- Money in the fund may only be used as provided under subsection (e) or as annually appropriated by the General Assembly. In making an appropriation from the fund, the General Assembly shall consider the Commonwealth's trustee duties under section 27 of Article I of the Constitution of Pennsylvania.

(d) Priority. -- Money appropriated from the fund under a General Appropriation Act or other appropriation act shall be distributed prior to allocations under subsection (e).

(e) Annual transfers. -- The following apply:

(1)(i) Except as provided under subparagraph (ii), for the 2017-2018 fiscal year and each fiscal year thereafter, $20,000,000 shall be transferred from the fund to the Marcellus Legacy Fund for distribution to the Environmental Stewardship Fund.

(ii) No amount shall be transferred from the fund to the Marcellus Legacy Fund for distribution to the Environmental Stewardship Fund for the 2019-2020, 2020-2021 and 2021-2022 fiscal year.

(2) For the 2017-2018 fiscal year and each fiscal year thereafter, $15,000,000 shall be transferred from the fund to the Marcellus Legacy Fund for distribution to the Hazardous Sites Cleanup Fund.

72 P.S. § 1601.2-E.

to remove the Lease Fund from the sole control of the DCNR, where its use was restricted to "conservation, recreation, dams, or flood control," and instead to transfer the control to the General Assembly. 71 P.S. § 1331 (repealed). Subsection (c), however, directs that "[m]oney in the [Lease Fund] may only be used as provided under subsection (e) [directing specific annual transfers] or as annually appropriated by the General Assembly." 72 P.S. § 1601.2-E(c). Subsection (c) additionally mandates that "the General Assembly shall consider the Commonwealth's trustee duties under section 27 of Article I of the Constitution of Pennsylvania," when making appropriations from the Lease Fund. 72 P.S. § 1601.2-E(c).

PEDF asserts that the repeal of the Oil and Gas Lease Fund Act and transfer of the Lease Fund in Section 1601.2-E violated the Environmental Rights Amendment because the General Assembly eliminated the restrictions on the use of the funds that had been explicitly imposed by the Oil and Gas Lease Fund Act. It also claims that the removal of the Lease Fund from DCNR's control eliminated the prior arrangement whereby DCNR had the statutory authority both to lease State forest and park lands for oil and gas exploration and extraction and to dispense funds to remedy any harm resulting from those leases. PEDF deems the restrictions imposed by subsection (c) on the General Assembly to be insufficient, asserting that subsection (c) fails to restrict Lease Fund monies solely for conservation and maintenance of Pennsylvania's natural resources.

In response, the Commonwealth emphasizes that the repeal and transfer did not result in the elimination of the Lease Fund but rather the explicit continuation of the Lease Fund as a "special fund in the State Treasury," 72 P.S. § 1601.2-E(a). Moreover, the Commonwealth highlights this Court's observation in *PEDF II*, that "the legislature's diversion of funds from the Lease Fund (and from the DCNR's exclusive control) does not, in and of itself, constitute a violation of Section 27," as the ERA imposes trustee

duties not merely on the DCNR but on all Commonwealth entities.  Cmwlth. Brief at 19 (quoting *PEDF II*, 161 A.3d at 939).

The Commonwealth additionally highlights that the plain language of subsection (c) explicitly directs the General Assembly to consider its trustee duties under the ERA when making appropriations, in contrast to the provisions deemed unconstitutional in *PEDF II*, which allowed for unrestricted transfers to the General Fund for non-trust uses. Indeed, it argues that any appropriation by the General Assembly of Lease Fund monies for non-trust purposes would violate Section 1601.2-E(c), in addition to Section 27.

The Commonwealth Court addressed PEDF's challenges to subsections (a) and (c) separately.  In addressing the "continuation" of the Lease Fund in subsection (a), the Commonwealth Court rejected PEDF's facial challenge, concluding that the absence of explicit restrictions on the use of the Lease Fund in the text of Section 1601.2-E(a) did not violate Section 27, given that all Commonwealth entities were bound by "Section 27's constitutional requirement that trust principal must be used for trust purposes."  *PEDF IV*, 2020 WL 6193643, at *11.

The court, however, found support in *PEDF II* for PEDF's challenge to subsection (c).  Specifically, it equated subsection (c)'s language, dictating that the "General Assembly shall consider the Commonwealth's trustee duties under [S]ection 27," to language that this Court deemed inadequate to remedy the constitutional violation in *PEDF II*, where Section 1602-E instructed that the "General Assembly shall consider the adoption of an allocation to municipalities impacted by a Marcellus well."  *PEDF IV*, 2020 WL 6193643, at *13.

The Commonwealth Court, nevertheless, concluded that Section 1601.2-E(c) did not facially violate Section 27 relying again upon its analysis in *PEDF III*, which deemed it permissible to use one-third of the non-royalty revenues for non-trust purposes.  In so doing, the court distinguished the section deemed unconstitutional by this Court in *PEDF*

*II*, which solely involved a transfer of royalties, from the section at issue in the current case, which directed a transfer from the Lease Fund generally. Given that it was possible that the transfers could be encompassed within the one-third that it viewed as permissible to use for non-trust purposes, the court concluded that PEDF failed to demonstrate that Section 1601.2-E(c) facially violated the ERA. Accordingly, the Commonwealth Court granted the Commonwealth's application for declaratory relief and denied PEDF's contrary application.

As with the Commonwealth Court's analysis of PEDF's challenge to the use of Lease Fund assets for DCNR's general operations, we affirm the court's denial of PEDF's proposed declaration but diverge from its reasoning to the extent it relies upon the now-rejected analysis in *PEDF III* permitting one-third of non-royalty revenues to be used for non-trust purposes. In contrast, we conclude that the decision in *PEDF II* answers PEDF's challenge to both Subsections 1601.2-E(a) and (c).

In *PEDF II*, we observed that "that the legislature's diversion of funds from the Lease Fund (and from the DCNR's exclusive control) does not, in and of itself, constitute a violation of Section 27," because DCNR is not the only Commonwealth entity with a fiduciary duty under Section 27. *PEDF II*, 161 A.3d at 939. Instead, all Commonwealth entities, including the General Assembly, are bound to conserve and maintain Pennsylvania's public natural resources. *PEDF II*, 161 A.3d at 931 n.23. Thus, as we explained in both *PEDF II* and *PEDF V*, "the General Assembly would not run afoul of the constitution by appropriating trust funds to some other initiative or agency dedicated to effectuating Section 27." *PEDF II*, 161 A.3d at 939; *PEDF V*, 255 A.3d at 314 n.21.

Section 1601.2-E(c) expressly reminds the General Assembly of its duties in administering the Lease Fund mandating that "the General Assembly shall consider the Commonwealth's trustee duties under section 27 of Article I of the Constitution of Pennsylvania." 72 P.S. § 1601.2-E(c). In contrast to the Commonwealth Court and the

Concurring and Dissenting Opinion, we find subsection (c)'s reiteration of the General Assembly's Section 27 duties to be entirely distinguishable from the constitutionally insufficient provision in Section 1602-E, under review in *PEDF II*, which merely directed the Commonwealth to "consider . . . an allocation to municipalities impacted by a Marcellus well." 72 P.S. § 1602-E. The fact that both statutes use the verb "consider" does not render them equivalent. Rather, the operative portion of the provision is what follows the verb: specifically, what must be considered. While one requires consideration of mandatory trustee duties imposed by Section 27, the other suggests a specific allocation of resources to one of many potentially constitutional purposes.

We further observe that the language of subsection (c) seems intended to remedy the fault identified in *PEDF II*. In that case, we criticized the statute reviewed therein for the absence of any "indication that the General Assembly considered the purposes of the public trust or exercised reasonable care in managing the royalties in a manner consistent with its Section 27 trustee duties." *PEDF II*, 161 A.3d at 938. The current language addresses these failings by expressly requiring that "the General Assembly shall consider the Commonwealth's trustee duties under section 27 of Article I of the Constitution of Pennsylvania." 72 P.S. § 1601.2-E(c). Thus, we reject PEDF's facial challenge to the repeal of the Oil and Gas Lease Fund Act and its continuation in Section 1601.2-E. [21]

---

[21] In rejecting PEDF's challenge, we agree with Justice Dougherty's statement that Section 27 and our decisions in *PEDF II* and *V* require the General Assembly to "'exercise reasonable care' in administering the trust." Concurring and Dissenting Opinion at 4 (quoting *PEDF II*, 161 A.3d at 938) (Dougherty, J.). Respectfully, we diverge from the responsive opinion because we read the current language of Section 1601.2-E(c) to incorporate the duty to exercise reasonable care. *See* 1 Pa.C.S. § 1922(3) (providing that in interpreting legislative intent, courts may presume "[t]hat the General Assembly does not intend to violate the Constitution").

As stated above, Section 1601.2-E(c) instructs that the General Assembly "shall consider the Commonwealth's trustee duties under section 27 of Article I of the

While Section 1601.2-E(c) is facially constitutional as it requires the General Assembly to consider its mandatory trustee duties and does not authorize the Commonwealth to use trust assets for non-trust purposes, our holding herein does not negate the potential of an as applied challenge to the General Assembly's ultimate appropriation of the Lease Fund. We reiterate that in expending funds from the newly transferred Lease Fund, the General Assembly has a duty to conserve and maintain the Section 27 trust assets which "implicates a duty to prevent and remedy the degradation, diminution, or depletion of our public natural resources" and a duty to act toward the corpus of the trust "with prudence, loyalty, and impartiality." *PEDF II,* 161 A.3d at 932 *(quoting Robinson Twp.*, 83 A.3d at 956–57).[22]

### D. Section 1601.2-E(b) – Commingling of Funds

PEDF next challenges the constitutionality of Section 1601.2-E(b), which sets forth the "sources" of the Lease Fund. Specifically, it provides for the inclusion in the Lease

Constitution of Pennsylvania." While the responsive opinion reads this phrase as providing for the General Assembly's "mere consideration" of its trustee duties, we view this language as an express reminder to the General Assembly of its mandatory duties imposed by the Constitution. Concurring and Dissenting Opinion at 8. The statute's arguably inarticulate use of the verb "consider" does not negate the mandatory nature of the General Assembly's Section 27 duties.

These duties, as interpreted by this Court in *PEDF II* and *V*, include, *inter alia*, the duty to act with prudence toward the corpus of the trust, which is defined as incorporating the duty of "exercising reasonable care, skill and caution" in administering the trust. 20 Pa.C.S. § 7774. While the General Assembly could have listed each of the Section 27 trustee duties or quoted this Court's summary of those duties, including the exercise of reasonable care, the absence of such explication does not undermine the constitutionality of Section 1601.2-E(c).

[22] In conjunction with this and the other arguments raised, PEDF seeks a declaration that the Commonwealth must "petition the court for a declaration of compliance with Section 27 prior" to engaging in the challenged activities. PEDF Brief at 58. We reject this argument outright as our constitution's tripartite system of government does not provide for judicial pre-approval of legislative or executive action.

Fund of trust assets of "rents and royalties from oil and gas leases of land owned by the Commonwealth" along with funds derived from the Indigenous Mineral Resources Development Act and "[a]ny other money appropriated or transferred to the fund."[23] PEDF contends that this comingling of trust and non-trust assets violates the basic trust principle requiring a trustee to maintain separate accounts for trust assets. The Commonwealth responds that Section 27 does not mandate separate accounts.

The Commonwealth Court rejected PEDF's assertions, determining that the addition of other funds to the Oil and Gas Lease Fund did not render the statute facially unconstitutional given that the statute could be applied constitutionally if the Commonwealth appropriated the entirety of the funds solely for trust purposes. The court cautioned, however, that a constitutional issue could arise if the Lease Fund was used for non-trust purposes. Thus, it opined that the Commonwealth trustees should maintain "a clear accounting and identification of corpus funds . . . to ensure that these funds are properly used in strict compliance with Section 27."[24]  Id. at *12.  It concluded, however, that while the Commonwealth should engage in an accounting, the absence of language requiring an accounting did not render Section 1601.2-E(b) unconstitutional.

We affirm the Commonwealth Court's holding.  We reiterate that a party challenging a duly-enacted statute has the burden of demonstrating that the statute "clearly, plainly, and palpably violates the Constitution."  *PEDF II*, 161 A.3d at 929 (internal quotation marks omitted).  In this case, PEDF failed to demonstrate that Section 1601.2-

---

[23] Section 1601.2-E(b) is set forth in full *supra* at 22, n.20.

[24] The court granted PEDF's separate request for a declaration that the "Commonwealth, as trustee of Pennsylvania's public natural resources, is required to keep detailed accounts of the trust monies derived from the oil and gas leases and track how they are spent as part of its administration of the trust."  *PEDF IV*, 2020 WL 6193643, at *17.  The Commonwealth has not appealed that holding to this Court.

E(b) is facially unconstitutional given that the Commonwealth may fulfill the dictates of Section 1601.2-E(b) without violating its trustee duties under Section 27, by segregating the monies from the different funds and keeping an accurate accounting.[25]  Moreover, as noted by the Commonwealth Court, it may avoid improper expenditure of the funds by restricting the Lease Fund's use solely to trust purposes.  Accordingly, we conclude that PEDF failed to demonstrate that Section 1601.2-E(b) is facially unconstitutional.

### E.  Section 1726-G of the Fiscal Code

Finally, PEDF challenges Section 1726-G's transfer of funds from the Keystone Recreation, Park and Conservation Fund ("Keystone Fund") to the General Fund.[26]  It emphasizes that the Keystone Fund had previously been used by the DCNR to improve

---

[25] A trustee has a duty to maintain "adequate records of the administration of the trust" and to "keep trust property separate from the trustee's own property."  20 Pa.C.S. § 7780(a), (b).

[26] Section 1726-G of the Fiscal Code, entitled "Fund transfers," provides as follows:

> During the 2017-2018 fiscal year, $300,000,000 shall be transferred from amounts available in special funds and restricted accounts to the General Fund. The transfers under this section shall be in accordance with the following:
>
> (1) The Secretary of the Budget shall transmit to the State Treasurer a list of amounts to be transferred from special funds and restricted accounts to the General Fund.
>
> (2) Upon receipt of the list under paragraph (1), the State Treasurer shall cause the transfers under paragraph (1) to occur.

72 P.S. § 1726-G.  Included in the $300,000,000 was a transfer of $10,000,000 from the Keystone Fund to the General Fund.  *See* Petitioner's Brief in Supp. of Application for Summ. Relief, Exhibit J, Commonwealth's Supplemental Answer and Objections to First Set of Interrogatories, ¶16.

State forest and parks. [27] PEDF claims that reducing this line of funding constitutes a violation of the Commonwealth's trustee obligations under Section 27, which should have entailed public notice and an evaluation of the effect of the transfer of these funds on DCNR and the projects affected by the reduced funding.

The Commonwealth Court denied relief to PEDF. The court observed that the Keystone Fund derives not from the proceeds of oil and gas leasing but instead from the sales of bonds and notes and the State Realty Transfer Tax. *PEDF IV*, 2020 WL 6193643, at *15 (citing 32 P.S. § 2014). Thus, it opined that "the transfer of funds from the Keystone Fund to the General Fund does not run afoul of Section 27 or impugn the Commonwealth's fiduciary duties as trustee." *Id.*

The Commonwealth Court additionally rejected PEDF's claim that the Commonwealth entities breached their fiduciary duties by failing to provide public evaluation of the environmental impact of the transfer from the Keystone Fund. The court concluded that Commonwealth entities are not obligated by their fiduciary responsibilities under Section 27 to provide public evaluation of every transfer of non-trust funds that might implicate Pennsylvania's natural resources.

We affirm the Commonwealth Court's denial of PEDF's proposed declaration in regard to Section 1726-G based upon its conclusion that the transfer from the Keystone Fund does not implicate Section 27. As the Commonwealth Court observed, the Keystone Fund does not involve trust assets but rather allocates funds derived from non-trust sources of Commonwealth revenue. We likewise do not find support in Section 27 or basic trust law for PEDF's claim that the Commonwealth must provide a public evaluation for every decision that could potentially impact Pennsylvania's natural resource trust.

---

[27] The General Assembly provided that one of the purposes of the Keystone Act, which created the Keystone Fund is to provide "[a] predictable and stable source of funding" funding for state parks. 32 P.S. § 2012(6).

## IV. Conclusion

For the reasons set forth above, we affirm the order of the Commonwealth Court, while rejecting that portion of the court's analysis derived from its decision in *PEDF III*, 214 A.3d 748.

Justices Todd, Donohue and Mundy join the opinion.

Justice Donohue files a concurring opinion in which Justice Todd joins.

Justice Mundy files a concurring opinion.

Justice Dougherty files a concurring and dissenting opinion.

Justice Wecht files a concurring and dissenting opinion.

Former Justice Saylor did not participate in the consideration or decision of this matter.